**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LEVONNA WILKINS, on behalf of herself** | ) | |
| **and others similarly situated,** | ) | |
| **Plaintiff,** | ) | **Case No. 13 C 5806** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **JUST ENERGY GROUP, INC., JUST** | ) | |
| **ENERGY ILLINOIS CORP.,** | ) | |
| **COMMERCE ENERGY, INC., and JUST** | ) | |
| **ENERGY MARKETING CORP.,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Levonna Wilkins filed this lawsuit, which is styled as a class action, claiming that the defendants misclassified her as an independent contractor and an outside salesperson pursuant to the Illinois Minimum Wage Law, 820 Ill. Comp. Stat. § 105/1, *et seq*. (IMWL"). Jurisdiction is based on the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). In the defendants' motion for summary judgment, they contend that Wilkins is outside the ambit of the IMWL because she is an outside salesperson. Wilkins' motion for class certification is also before the court. For the following reasons, the motion for summary judgment is denied and the motion for class certification is granted.

### I. BACKGROUND[1]

#### A. Just Energy Illinois and The Westmont, Illinois Regional Office

At the relevant time, defendant Just Energy Illinois was licensed under the Illinois Commerce Commission and its applicable regulations to sell natural gas to residential and

---

[1] The background section is largely drawn from the parties' Local Rule 56.1 submissions. The court has also added in relevant undisputed facts in the parties' briefs addressing Wilkins' motion for class certification.

commercial customers.  Defendant Just Energy Group hires individuals to go door-to-door on

behalf of affiliated entities in Illinois, including Just Energy Illinois, Commerce Energy, and Just

Energy Marketing Corporation.[2]  The primary objective of these workers is to convince prospects

to sign up for Just Energy Illinois' Natural Gas RateFlex and Just Green programs (collectively

"RateFlex Programs").  These programs require customers to commit to a four or five year

natural gas supply plan that purportedly saves customers money.  If a prospect decides to switch

to Just Energy, the first step in enrolling is signing a RateFlex Program Customer Agreement

("Agreement").

National distributor William Nicholson, regional distributor Michael Barnett, and crew

coordinators (individuals who lead teams of door-to-door workers) work at Just Energy Illinois'

Westmont Regional Office.  These individuals, among other things, provide orientation, sales

training and support to the door-to-door workers.[3]  The defendants contend that the regional

distributors in Illinois run their offices as they wish, and that the regional distributors are

themselves independent contractors.

---

[2]  The court will refer to the defendants collectively as "Just Energy" unless it is necessary
to specify a separate defendant.  The court will also refer to the workers as "door-to-door
workers," despite the fact that their official job title, bestowed by Just Energy, is "independent
contractor."  In this regard, Just Energy's Local Rule 56.1 statement of facts asserts that Just
Energy hires independent contractors to make door-to-door sales on its behalf.  Wilkins does not
contest this "fact."  The classification of Just Energy's workers is a legal issue, and legal
arguments in Rule 56.1 submissions are improper.  *See, e.g.*, *Judson Atkinson Candies, Inc. v.
Latini–Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008).  Thus, although Wilkins
does not challenge this portion of Just Energy's statement of facts, the court must nevertheless
determine if Just Energy correctly classified its door-to-door workers as independent contractors.

[3]  To the extent that the court uses the terms "sales" or "salespeople," it does so because
the parties use these terms.  The word choice does not reflect a conclusion that the workers were,
in fact, making sales.  *See Hurt v. Commerce Energy, Inc.*, No. 1:12-CV-00758, 2013 WL
4427257, at *1 n.9 (N.D. Ohio Aug. 15, 2013).

**B.      Wilkins' Position With Just Energy Illinois**

Plaintiff Levonna Wilkins worked at Just Energy Illinois' Westmont, Illinois, location for

a total of eleven days (per the summary judgment filings) or approximately one month (per the

class certification filings).  She exclusively promoted Just Energy Illinois products as a door-to-

door worker pursuant to an agreement she signed on April 9, 2013, that identified her as an

independent contractor.

When Wilkins interviewed for her position, she was told that Just Energy Illinois was a

gas supplier and that the position required her to go door-to-door "to sign people up for" Just

Energy Illinois' gas service. (Pl. Dep. at 43:7-14).  Wilkins had no prior sales experience.  After

she was hired, Wilkins was required to follow the rules, policies and procedures set forth in Just

Energy's employee handbook, Code of Business Conduct and Ethics Policy, and Compliance

Matrix.  In addition, Just Energy Illinois gave Wilkins a document entitled "Independent

Contractor Manual."  (Pl. Dep. Ex. 12A and 12B).  Wilkins' position could have been terminated

if she failed to comply with any of Just Energy's rules, policies, or procedures.  While working

for Just Energy Illinois, Wilkins was not allowed to work for a competitor, a customer, or a

supplier.

Before hitting the pavement as a door-to-door worker tasked with making in-person cold

calls, Wilkins completed a two-day training program that covered, among other things, the

disclosures that needed to be made to customers prior to enrolling them into the RateFlex

Programs and the components of the form given to customers outlining the conditions under

which they can cancel their enrollment in the RateFlex Programs.  Wilkins chose to memorize a

script explaining the RateFlex Programs to customers (other workers followed the script to

varying degrees but appear to have provided the information outlined in the script). Just Energy Illinois provided training about ways to keep potential customers engaged at the door so that door-to-door workers could convince them to sign Agreements.

Following her initial training, Wilkins had regular opportunities to engage in sales role playing and to hone sales techniques, such as body language and asking appropriate questions about potential customers' Nicor or People's Gas bills. At her deposition, Wilkins agreed that she received training on how to "close the deal with the customer." (Pl. Dep. 267:18-23).

Wilkins began her tenure as a door-to-door worker with Just Energy Illinois by partnering with a more seasoned employee. After she learned the sales script and felt comfortable, she began to knock on doors by herself. Wilkins spent the majority of her time out in the field going "door-to-door" to residential customer's homes, and spent approximately one hour per day at Just Energy Illinois' office. When at potential customers' doors, Wilkins recited the sales script, asked the prospects for a copy of their utility bill to see if they were eligible for the program, explained the program and the cancellation policy, and attempted to get the prospects to sign Agreements. Wilkins understood that the accountholder or spouse were the only individuals who could sign an Agreement because they were the only people who could enter into a legally binding contract to purchase natural gas.

A crew coordinator employed by Just Energy Illinois decided where Wilkins would work and what time she would go home, and transported Wilkins and other door-to-door workers to and from their daily work locations in a van. Although Just Energy's orientation manual tracks

this practice, the defendants contend that in the field, workers were free to set out on their own.[4]

The crew coordinators supervised a team of approximately eight workers and acted as door-to-door workers themselves. The crew coordinators earned commissions for Agreements that they and members of their team secured. When Wilkins worked for Just Energy Illinois, she worked from 11:00 a.m. to at least 8:00 p.m. six days per week. Other door-to-door workers had more flexible schedules.

At her deposition, Wilkins testified that she was required to wear a Just Energy hat and polo shirt when engaging in door-to-door marketing. In contrast, according to putative class member Ryan Goldman, Illinois law mandated that he wear a Just Energy badge but Just Energy did not have a dress code. He – and the majority of Just Energy Illinois workers – nevertheless generally chose to wear clothing with the "Just Energy" name because it made them look more official when knocking on prospects' doors.

Wilkins completed "street sheets" indicating the addresses she had visited and stating whether she had reached a "deal" at each location. According to Wilkins, she terminated her relationship with Just Energy Illinois after her car broke down and she could not drive to work or afford to take public transportation.

---

[4] William Nicholson, a national distributor for Just Energy, testified at his deposition that door-to-door workers were not required to work as part of a team led by a crew coordinator but that going out with a team was the way that the workers received support. In his experience, "people seek out support because if they – they want to do well at something, they may want extra training or extra time or support. So, going with a crew coordinator, you know, when they choose to do that, it helps them to become more successful salespeople." Nicholson Dep., Dkt. 56-7 at 36:14-21.

C.     **Just Energy Illinois' Sales and Commission Process**

The Agreements require customers to affirm that they "choose Just Energy Illinois Corp.

d/b/a Just Energy to be my supplier of natural gas for a term of 4 or 5 years" and that they agree

that they "have read and agree" to the terms and "have signing authority." (Pl. Ex. 1). The

Agreement also include a Notice of Cancellation form explaining that the customer can cancel

the "transaction" without any penalty or obligation within 10 business days of the date on the

utility notice confirming you have switched your gas supply to Just Energy." (*Id.*). In addition,

the door-to-door workers require customers to sign an acknowledgment form that outlines the

regulatory requirements governing the transaction. This form includes a statement that "the

representative explained that I am entering into a contract for the Natural Gas Rate Flex Program

with Just Energy to supply Gas" and that the customer agrees to "pay the related charges." (Pl.

Dep. Ex. 5).

If a customer signs an Agreement, the worker must use the customer's phone to call a

third party verifier. The verifier ensures that the customer agreed to engage Just Energy Illinois

for gas services. The third party verifier is not allowed to explain the RateFlex programs, so

prior to calling, the worker attempts to ensure that the customer understands the programs and

has agreed to enroll. Prior to leaving a customer's residence, the worker informs the customer

that the Agreement will be processed and that in a few weeks, the customer will receive a

welcome letter stating when the RateFlex programs will begin.

Individuals who promote the RateFlex programs and attempt to convince prospects to

sign up are paid via a commission system. They receive $60 for each customer who enrolls, an

additional $30 for each customer who enrolls in the "Just Green" program, and an additional $15

and $5 per contract if customers remain enrolled after certain lengths of time. If a customer

cancels within ten days after signing an Agreement, no commission is paid.

Wilkins understood that under this structure, she could potentially earn more money than

she would have made working hourly for the minimum wage. Other putative class members

have been successful working on commission. For example, putative class member Goldman

earned $200 his first week. However, by his second week, he earned over $1,000, and by his

third week he was "almost at three thousand dollars for the week." (Goldman Dep. 59:23-60:5).

One year, Goldman earned $80,000 working for Just Energy Illinois. Goldman estimated that he

was paid commissions on 90-95% of the Agreements he turned in.

### D.     The Percentage of Agreements That Are Cancelled

Agreements can be cancelled before they flow into Just Energy's system. The parties

refer to the time period as the "pre-flow" stage. Cancellations are important because, as noted

above, commissions are not paid on canceled Agreements. At the pre-flow stage, customers can

change their minds. Additional customers can drop out at the third party verification stage,

because if a customer asks the verifier questions, the verifier hangs up. Pre-flow cancellations

can also occur if the customer already had a contract with Just Energy Illinois, the customer

moved prior to starting service or provided an incorrect meter number, a utility rejected service

(*e.g.*, Nicor or People's gas declined to accept the customer), or the customer provided invalid

information when filling out the Agreement.

The Agreements authorize Just Energy to cancel at its discretion. Just Energy asserts that

it generally cancels Agreements based on a specific reason, such as poor credit. Wilkins did not

control whether Just Energy would approve an Application. Sales data for the Westmont office

shows that in 2013, door-to-door workers secured 4,426 Agreements. 277 (5.13%) of these Agreements were cancelled pre-flow at Just Energy's discretion due to a failed credit check. In 2012, there were 5,260 Agreements associated with the Westmont office. 438 (8.33%) of them were cancelled pre-flow at Just Energy's discretion due to a failed credit check. During this time period, a total of 2,084 of the Agreements were cancelled pre-flow, and 1,396 Agreements were cancelled post-flow, for a total of 3,480 cancelled Agreements. If an Agreement is canceled post-flow, the door-to-door worker may be required to return his or her commission. This is referred to as a "clawback."

**E.    The Illinois Commerce Commission's Oversight of Just Energy Illinois' Sales Activities**

As a gas supplier in Illinois, Just Energy Illinois is regulated by the Illinois Commerce Commission ("ICC") and is subject to the Alternative Gas Supplier Law ("AGSL"), 220 Ill. Comp. Stat. § 5/19-101, *et. seq*. The AGSL specifically regulates "sales agents," who include "any employee, agent, independent contractor, consultant, or other person that is engaged by the alternative gas supplier to solicit customers to purchase, enroll in, or contract for alternative gas service on behalf of an alternative gas supplier." 220 Ill. Comp. Stat. § 5/19-105. In addition, the AGSL mandates that a "qualified independent third party" must verify a customer's authorization to enroll. 220 Ill. Comp. Stat. § 5/19-115(c)(2).

The ICC and the Illinois Attorney General have repeatedly referred to Just Energy Illinois' door-to-door workers as salespeople when considering issues arising under the AGSL and the Illinois Consumer Fraud and Deceptive Practices Act ("CFDPA"). *See* Def. Facts at ¶ 59 (citing *Illinois v. Illinois Energy Savings Corp.*, No. 08CH04913 (Cook Cty. Cir. Ct., Mar. 17,

-8-

2008), Compl. at ¶¶ 6, 11-12; *Citizens Utility Bd. v. Illinois Energy Savings Corp.*, No. 08-0175 (Ill. Comm. Comm'n, Mar. 3, 2008, verified complaint); *Citizens Utility Bd. v. Illinois Energy Savings Corp.*, No. 08-0175 at 52-53 (Ill. Comm. Comm'n, Apr. 13, 2010 Order); Audit of Just Energy Ill. Corp., 10-0398, 2010 Ill. PUC LEXIS 97 at *4 (Ill Comm. Comm'n, June 23, 2010)). Specifically, both the Illinois Attorney General and the ICC described the door-to-door workers as sales agents. Dkt. 73-1, PageID #1927, 1960. In addition, the ICC alleged in a verified complaint that the workers engaged in "door-to-door canvassing in [a] service area to solicit customers" and subsequently ordered an audit of the "sales program" targeted at getting prospects to sign Agreements. *Id*. at PageID # 1945, 2016.

Just Energy Illinois was held liable under the AGSL and the CFDPA in proceedings brought by the ICC and the Illinois Attorney General, . *Id*. at ¶¶ 60-61. These proceedings did not address whether the defendants complied with wage and hour laws.

## II. DISCUSSION

The defendants' motion for summary judgment and Wilkins' motion for class certification are before the court. Generally, a plaintiff's request to certify a class should be addressed "[a]s soon as practicable after the commencement of an action brought as a class action." Fed. R. Civ. P. 23(c)(1). Here, however, the parties briefed Wilkins' motion for class certification shortly before the defendants' motion for summary judgment. Given the current procedural posture, it appears sensible to consider the summary judgment motion first. *See Cowen v. Bank United of Tex., FSB*, 70 F.3d 937, 941 (7th Cir. 1995) (motions for class certification are usually filed before dispositive motions "[b]ut 'usually' is not 'always,' and

'practicable' allows for wiggle room."). For the following reasons, the defendants' motion for summary judgment is denied and Wilkins' motion for class certification is granted.

## A.      The Defendants' Motion for Summary Judgment

### 1.      Legal Standard

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

### 2.      The "Outside Salesperson" Exemption

The IMWL defines an "employer" as "any individual [or] governmental . . . body . . . acting directly or indirectly in the interest of an employer in relation to an employee." 820 Ill. Comp. Stat § 105/3(c). An "employee" is "any individual permitted to work by an employer in an occupation." 820 Ill. Comp. Stat § 105/3(d). "Generally, all employees are subject to the protections afforded by the Minimum Wage Law." *DeWig v. Landshire, Inc.*, 666 N.E.2d 1204, 1206 (Ill. App. 1996) (citing 820 Ill. Comp. Stat. § 105/4(a)). The "outside salesperson" provision is an exception to this rule. 820 Ill. Comp. Stat. § 105/3(d)(4). An "outside salesperson" is "regularly engaged in making sales or obtaining orders or contracts for services

where a major portion of such duties are performed away from his employer's place of business."

820 Ill. Comp. Stat. § 105/3(g).

### a. Burden of Proof

The parties disagree about who has the burden of showing that the "outside salesperson" exemption is applicable. "Because the IMWL parallels the FLSA so closely, courts have generally interpreted their provisions to be coextensive, and so have generally applied the same analysis to both." *Callahan v. City of Chicago*, — F. Supp. 3d —, No. 12 CV 262, 2015 WL 394021, at *24 (N.D. Ill. Jan. 23, 2015). With respect to the burden of proof, the defendants cite to *Jaworski v. Master Hand Contractors, Inc.*, No. 09 C 7255, 2013 WL 1283534 (N.D. Ill. Mar. 27, 2013). In *Jaworski*, the court held that under both the IMWL and the analogous provisions in the FLSA, the plaintiffs had the burden of showing that they were employees rather than independent contractors. *Id*. at *2, *7.

In contrast, in an FLSA case about the "outside salesperson" exemption, the Seventh Circuit held that "[t]he burden is on the employer to prove that an employee is exempt under FLSA, and such exemptions are to be narrowly construed against the employer seeking the exemption." *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631 (7th Cir. 2010) (internal citation omitted); *see also Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 93 (2008) (as a "general rule," the employer bears the burden of proof when claiming that a FLSA exemption applies). Since the IMWL's "outside salesperson" exemption is at issue in this case, Seventh Circuit precedent about the FLSA's analogous "outside salesperson" exemption is more persuasive than a district court opinion about the independent contractor exemption in the FLSA and the IMWL.

-11-

The court thus finds that the defendants bear the burden of showing that Wilkins and the members of the putative class fall within the "outside salesperson" exemption. The defendants must carry their burden using the preponderance of the evidence standard. *See Yi v. Sterling Collision Ctr., Inc.*, 480 F.3d 505, 506-07 (7th Cir. 2007); *Rogers v. AT & T Serv., Inc.*, No. 11 C 5550, 2014 WL 4361767, at *5 (N.D. Ill. Sept. 3, 2014). Ultimately, however, the burden of proof issue does not appear to be dispositive as the court has considered the entire record, in the light most favorable to Wilkins, the non-movant, and the outcome does not turn on who bears the burden of proof.

> **b.    Are Door-to-Door Workers Exempt Outside Salespeople Under the IMWL?**

It is undisputed that the door-to-door workers played a role in the sales process. The parties disagree, however, about whether the workers' role in that process is sufficient to make them fall within the ambit of the IMWL's "outside salesperson" exception. In the absence of Illinois Supreme Court authority, a federal court applying Illinois law must attempt to predict how the Illinois Supreme Court would decide an issue. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 936 (7th Cir. 2012). In making that prediction, the decisions of the Illinois Appellate Court are non-binding but persuasive "unless [the court has] a compelling reason to doubt that they have stated the law correctly." *AAR Aircraft & Engine Grp., Inc. v. Edwards*, 272 F.3d 468, 470 (7th Cir. 2001).

The defendants characterize the Illinois Appellate Court's decision in *DeWig v. Landshire, Inc.*, 666 N.E.2d 1204 (Ill. App. 1996), as the "leading case applying the outside sales exception under the IMWL." Dkt. 73-1 at 8. *DeWig* appears to be the only case squarely

addressing the outside sales exception in the context of the IMWL, as opposed to the FLSA. As discussed below, the *DeWig* decision was not unanimous and the majority's analysis is at odds with analogous FLSA cases so it is unpersuasive. In any event, the facts in *DeWig* are distinguishable from the facts of Wilkins' case. Thus, *DeWig* does not establish that the "outside salesperson" exemption applies.

The defendant in *DeWig* was "in the business of selling sandwiches and delicatessen foods to convenience stores, schools and other outlets." *DeWig*, 666 N.E.2d at 1205. "Route salesmen" such as plaintiff DeWig delivered the food. The defendant assigned DeWig a route each day and told him what stops to make and the order in which he was to make them. When he arrived at a stop, DeWig removed outdated products from store shelves, replaced them with new products, told the store manager the amount owed, and collected cash or a credit slip. DeWig knew that he was expected to attempt to increase the amount of products sold at each stop by, for example, soliciting additional shelf space for the defendant's products. At the end of each day, DeWig returned to the defendant's facility, inventoried the unused product, and performed other administrative tasks. DeWig worked approximately eleven hours per day, was paid on commission based on his product sales, and received a bonus for acquiring new accounts that ordered food for at least three months. If DeWig's commissions did not reach a base weekly amount, he was paid the base amount. DeWig was employed for 69 weeks and received the base amount 58 times.

DeWig argued that he was merely a route driver who made deliveries to established accounts pursuant to his employer's instructions, who did not attempt to find clients or obtain

orders on his own initiative. A majority of the *DeWig* panel rejected this position and held that

the "outside salesperson" exemption applied. It reasoned that DeWig:

> was not a salesman in the traditional sense. His occupation was more of a hybrid between
> a deliveryman and a salesman. In fact, it encompassed both functions. However, the
> legislature has clearly set forth the parameters for which the term "outside salesman"
> applies. It makes no mention of commission potential or employer control as factors to
> be considered. It only lays out a pattern of conduct as its definition, with such pattern of
> conduct clearly applying to DeWig's employment activities.

*Id*. at 1206. In other words, the majority found – without providing a detailed explanation – that

DeWig's daily activities met the definition of an "outside salesperson."

The dissent, however, disagreed that DeWig "regularly engaged in making sales" simply

because a small portion of his duties involved completing a sale. *Id*. at 1207. The dissent looked

to the FLSA, which provides that a route salesman is not exempt from minimum wage and

overtime laws "unless his employer can establish that his chief duty or primary function is to

make sales." *Id*. at 1208 (citing 29 C.F.R. § 541.505(a)). To determine if this test has been met,

"courts consider the nature of the job as a whole, taking into account the actual amount of time a

route salesman spends performing various sales and non-sales duties, the amount of autonomy an

employee has in making sales transactions, and whether the employee's compensation is tied to

his sales ability." *Id*.

Applying that standard to DeWig, the dissent concluded that the outside salesperson

exception did not apply, since DeWig spent the majority of his time performing non-sales tasks

such as stocking shelves and driving to the various stops on his route. The dissent also noted that

although DeWig was entitled to earn commissions if his sales exceeded the base weekly amount,

he largely received the base amount. "This might suggest that DeWig was a poor salesman, or it

-14-

might suggest that the commission portion of [the defendant's] wage structure was based upon unattainable sales goals. If the latter view is taken, the finder of fact could reasonably infer that, in practice, [the defendant] paid its route salesmen a set wage that was not tied to their salesmanship skills." *Id*.

The defendants in this case argue that *DeWig* mandates the conclusion that Wilkins and her fellow door-to-door workers were outside salespeople because they spent most of the day away from their employer's place of business and were regularly engaged in securing signed Agreements. According to the defendants, "there is no genuine dispute that the [door-to-door workers] make the sale" like the plaintiff in *DeWig*. (Dkt. 73-1 at 10.)

The court disagrees. As noted above, under the IMWL, an "outside salesperson" is "regularly engaged in making sales or obtaining orders or contracts for services where a major portion of such duties are performed away from his employer's place of business." 820 Ill. Comp. Stat. § 105/3(g). With respect to the sales that DeWig made and the orders that he received, DeWig was authorized to bill the customer on the spot and receive payment, or give the customer a credit slip. *DeWig*, 666 N.E.2d at 1206. Thus, the sales made by DeWig either were consummated on the spot or closed at a later date when the customer paid the bill it had received from DeWig at the time of the transaction. The *DeWig* opinion does not indicate that any of the transactions initiated by DeWig were cancelled.

In contrast, the door-to-door workers in the instant case were not authorized to complete a transaction. Instead, the customer had to pass a credit check and the defendants had unlimited authority to reject Agreements. Although the defendants stress that most applicants passed the credit check (5.13% in 2013 and 8.33% in 2012), the record shows that of the 5,260 applications

-15-

for gas service generated by the Westmont office in 2012, 2,084 Agreements were cancelled pre-flow (including the 8.33% that were cancelled due to credit issues) and 1,396 of Agreements were cancelled post-flow.  Pl. Add'l Facts at ¶ 92.  The defendants do not explain why so many Agreements were canceled.

The percentage of cancellations is not, as the defendants imply, de minimis.  Moreover, post-flow cancellations are outside the control of the door-to-door workers.  Given the number of cancellations, *DeWig* is inapposite.  Fact questions exist about whether the door-to-door workers who obtained Agreements in fact "ma[de] sales or obtain[ed] orders or contracts for services" that were consummated.  *See* 820 Ill. Comp. Stat. § 105/3(g).

Similarly, fact questions exist about whether the door-to-door workers "regularly" made sales or obtained orders.  As noted by the dissent in *DeWig*, the fact that a small portion of a worker's duties involves making a sale does not necessarily mean that the worker "regularly engaged in making sales."  *DeWig*, 666 N.E.2d at 1207.  The dissent analogized to a person who is told to "regularly" visit his dentist and makes an appointment every five years. That is regular, in the sense that it is steady and consistent, but "most of us would think" that schedule was not "regular."  *Id*.  Wilkins did not obtain any signed Agreements and evidence in the record indicates that Just Energy Illinois' door-to-door workers had a high turnover rate.  While at least a few door-to-door workers were successful, fact questions exist about whether individuals like Wilkins, whose tenure with Just Energy was short and unremumerative, "regularly" made sales or obtained orders.  *See* 820 Ill. Comp. Stat. § 105/3(g).  Accordingly, *DeWig* fails to demonstrate that Just Energy is entitled to summary judgment based on the "outside salesperson" exemption.

-16-

This conclusion is supported by FLSA cases addressing the role that the amount of commissions plays in determining if a worker is an outside salesperson. Wilkins was paid on a pure commission basis and earned nothing during her short stint as a door-to-door worker. Others were more successful, such as putative class member Goldman. The turnover rate for door-to-door workers suggests that Wilkins – not Goldman – more closely represent the norm. Moreover, in the defendants' response to Wilkins' motion for class certification, they state that Goldman was a crew coordinator and thus earned commissions for Agreements that he and his team members had solicited. Goldman's commissions, therefore, may not be illustrative of commissions earned by most door-to-door workers.

A federal district court in Ohio considering a virtually identical case against different Just Energy defendants based on the FLSA found that there was a genuine issue of material fact about whether Just Energy's door-to-door workers "fit within the purpose of the FLSA's outside sales exemption." *Hurt v. Commerce Energy, Inc.*, No. 1:12-CV-00758, 2013 WL 4427257, at *9 (N.D. Ohio Aug. 15, 2013). As the *Hurt* court explained, "[t]he Supreme Court has said that the outside sales exemption is premised on the belief that exempt employees typically earned salaries well above the minimum wage and enjoyed other benefits that set them apart from the nonexempt workers entitled to overtime pay." *Id.* (internal quotations and alterations omitted) (quoting *Christopher v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2173 (2012)). The outside salesperson exemption also is based on the notion that exempt employees perform work that "[is] difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult and generally precluding the potential job expansion intended by the FLSA's time-and-a-half overtime

premium." *Christopher*, 132 S.Ct. at 2173. To the extent that Illinois Just Energy door-to-door workers earned nothing or earned less than the minimum wage on a consistent basis, a genuine issue of fact exists regarding the amount of the putative class' compensation. *See Hurt*, 2013 WL 4427257, at *9.

As an apparent alternative to its argument that the door-to-door workers made sales themselves like the plaintiff in *DeWig*, Just Energy also argues that under *Christopher*, the door-to-door workers are salespeople as a matter of law even if they did not close sales personally. The plaintiffs in *Christopher* were pharmaceutical sales representatives whose primary duty was to obtain commitments from physicians to prescribe certain prescription drugs when appropriate. 132 S.Ct. at 2161. The Supreme Court found that the representatives fell within the outside salesperson exemption even though they could not consummate any actual sales due to the nature of the pharmaceutical business.

The ruling in *Christopher* was based on a fact-intensive analysis of the job responsibilities of pharmaceutical sales representatives and their compensation structure. These responsibilities are completely different than the responsibilities of Just Energy door-to-door workers. In addition, the pharmaceutical sales representatives earned more than $70,000 annually before commissions "so [were] hardly the kind of employees that the FLSA was intended to protect." *Id.* at 2173. Wilkins, in contrast, earned $0 while she was a door-to-door worker. As noted above, fact questions exist about the range of commissions earned by door-to-door workers. Thus, *Christopher* is not controlling. The trier of fact will have to determine if Just Energy's commission structure, as applied to the putative class, is compatible with the

IMWL.  A similar question of fact exists about whether the type of work these individuals performed is "compatible with hourly pay."  *See Hurt*, 2013 WL 4427257, at *9.

### c.    Impact of Decisions by the Illinois Attorney General and the ICC

Just Energy includes the fall-back argument that the Illinois Attorney General and the ICC have "repeatedly taken the position that Just Energy Illinois' [door-to-door workers] engage in sales activities."  (Dkt. 73-1 at 12.)  According to Just Energy, while it does not argue that the doctrines of collateral estoppel and principles of equity and comity apply, the court should nevertheless adopt a "position consistent with that of the Illinois government" and find that the door-to-door workers are salespeople.  (Dkt. 73-1.)  The court need not address the propriety of following the decisions of the Illinois courts and the ICC because Just Energy overstates the scope of the state court and state administrative proceedings.

The ICC and the Illinois Attorney General referred to Just Energy Illinois' door-to-door workers as salespeople when considering whether Just Energy Illinois was liable under the AGSL and the Illinois Consumer Fraud and Deceptive Practices Act.  *See* Def. Facts at ¶ 59.  Neither the ICC nor the Illinois courts, however, found that the position of door-to-door worker for Just Energy Illinois was the type of position that qualifies for the outside salesperson exemption under the IMWL or the FLSA.

The proposition that the door-to-door workers engaged in sales-related activities is unremarkable, so calling these workers "salespeople" is accurate and descriptive.  But this designation does not transform them into "outside salespersons," as that term is used in the IMWL and the FLSA, because job responsibilities, as opposed to a job's name, are dispositive. *See Schaefer-LaRose v. Eli Lilly & Co.*, No. 1:07-CV-1133-SEB- TAB, 2008 WL 4247973 (S.D.

-19-

Ind. Sept. 11, 2008) (collecting cases); *Hurt v. Commerce Energy, Inc.*, No. 12-CV-00758, 2014 WL 4421307, at *2 (N.D. Ohio Sept. 8, 2014) ("This case turns on whether Defendant establishes an outside salesperson exemption. It does not turn on whether Plaintiffs made sales. The question is whether, in their sales efforts, Plaintiffs were sufficiently independent to qualify for the exemption."). Thus, the state proceedings do not compel the conclusion that the door-to-door workers qualify for the outside salesperson exemption.

Accordingly, the defendants' motion for summary judgment as to the outside salesperson issue is denied. The applicability of that exception, as well as the defendants' assertion that the door-to-door workers are independent contractors, not employees, cannot be resolved on this record.

## B. Wilkins' Motion for Class Certification

The two issues in this case are (1) the applicability of the outside salesperson exemption in the IMWL and (2) whether the door-to-door workers are independent contractors or employees. Pursuant to Fed. R. Civ. P. 23, Wilkins seeks to certify a class "consisting of all persons since August 14, 2010 who (a) were Illinois residents; (b) were listed on their Just Energy contract as performing services for Just Energy; (b) were treated as independent contractors; (c) had the job of going door-to-door for Just Energy; and (d) were not paid minimum wage and/or overtime." (Dkt. 40.)

### 1. Legal Standard for Class Certification

Federal Rule of Civil Procedure 23 allows class certification when the proposed class satisfies all of the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). *Wal-Mart, Inc. v. Dukes*, 131 S. Ct. 2541, 2548 (2011). The party seeking class certification

must present proof that the requirements of Rule 23 are satisfied, and the court must engage in a "rigorous analysis" and, if necessary, delve into "the merits of the plaintiff's underlying claim." *Id*. at 2551-52.

Rule 23(a) lists four prerequisites for certification "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *Wal-Mart*, 131 S. Ct. at 2548. These requirements "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart*, 131 S. Ct. at 2550 (internal quotation marks omitted).

Wilkins requests certification pursuant to Rule 23(b)(3), which applies when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and [when] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Although similar to commonality, 'the predominance criterion is far more demanding.'" *Starr v. Chicago Cut Steakhouse, LLC*, No. 12-cv-4416, — F. Supp. 3d —, 2014 WL 7146061, at *10 (N.D. Ill. Dec. 15, 2014) (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012)). "Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815.

### 2.      Rule 23(a)

Just Energy challenges commonality and typicality under Rule 23(a).  As discussed

below, Wilkins has satisfied all four elements of Rule 23(a).

### a.      Numerosity

Rule 23(a) first requires that the purported class be "so numerous that joinder of all

members is impracticable."  Fed. R. Civ. P. 23(a)(1).  As a general rule, a class with at least 40

members satisfies Rule 23's numerosity requirement.  *Costello v. BeavEx Inc.*, 303 F.R.D. 295,

305 (N.D. Ill. 2014).  According to Wilkins, the putative class consists of over 4,000 people.  The

numerosity requirement is satisfied.

### b.      Commonality

A class representative may sue on behalf of a class only if there are "questions of law or

fact common to the class."  Fed. R. Civ. P. 23(a)(2).  A common question exists when the "class

members are aggrieved by the same or similar conduct."  *Kurgan v. Chiro One Wellness Ctrs,*

*LLC*, No. 10-CV-1899, 2014 WL 642092, at *6 (N.D. Ill. Feb. 19, 2014) (citing *Keele v. Wexler*,

149 F.3d 589, 592 (7th Cir. 1998)).  Ultimately, class members' claims "must depend upon a

common contention[,] . . . . [which] must be of such a nature that it is capable of class-wide

resolution – which means that determination of its truth or falsity will resolve an issue that is

central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 131 S. Ct. at 2551.

Wilkins defines the common question as whether the defendants violated Illinois law by

failing to pay the door-to-door workers minimum wage and overtime.  Dkt. 46 at 6.  According to

Wilkins, this question turns on whether the members of the putative class were (1) employees,

not independent contractors, (2) were non-exempt (*i.e.*, that the outside salesperson exemption

does not apply), and (3) suffered damages.  In response, Just Energy contends that the regional distributors and crew coordinators at Just Energy's various offices in Illinois had substantial discretion in how the offices were managed and did not necessarily comply with Just Energy's global policies.  According to Just Energy, this resulted in differing levels of supervision and control for door-to-door workers so no common questions exist.  Just Energy also argues that Wilkins' limited work with one crew from the Westmont office means that she is unfamiliar with the work experiences of other members of the putative class.

"What matters to class certification . . . [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755-56 (7th Cir. 2014) (citing *Wal-Mart*, 131 S.Ct. at 2551).  "Where the defendant's allegedly injurious conduct differs from plaintiff to plaintiff . . . no common answers are likely to be found. " *Id*.  Just Energy's arguments about the alleged differences between the practices of its various Illinois offices are relevant to predominance and are discussed below.  *See Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1436-37 (2013) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)) (the predominance requirement asks if "questions of law or fact common to class members predominate over any questions affecting only individual members" and tests if the putative class is "sufficiently cohesive to warrant adjudication by representation").

With respect to commonality, Just Energy's Illinois offices uniformly treated its door-to-door workers as outside the scope of the IMWL based on its position that the workers were (1) independent contractors who (2) fell within the outside salesperson exemption.  Based on that position, Just Energy paid the workers on a pure commission basis.  Thus, there are common

questions as to liability. *See Kurgan*, 2014 WL 642092, at *6 (commonality existed when the defendant's "alleged failure to pay overtime and track hours of work resulted from a uniform, official, corporate policy of treating [workers] as exempt. This decision was made at the corporate level, not by individual supervisors at each location . . . . [and t]he legality of this uniform policy is the focus of this litigation") (citing *Dukes*, 131 S.Ct. at 2551); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488 (7th Cir. 2012) ("[B]ecause there was no company-wide policy to challenge in *Wal-Mart* – the only relevant corporate policies were a policy forbidding sex discrimination and a policy of delegating employment decisions to local managers – there was no common issue to justify class treatment.").

This is so despite individual questions about damages, as the commonality requirement can be satisfied even if damages are not uniform across the putative class. *See Kurgan*, 2014 WL 642092, at *6 (collecting cases). Similarly, the fact that Wilkins is familiar with the work of her own former team at the Westmont office and is not familiar with the work of all teams at all Illinois Just Energy offices is irrelevant. A class representative does not need to "have special knowledge of the case or possess a detailed understanding of the legal or factual basis on which a class action is maintained." *George v. Kraft Foods Global, Inc.*, 251 F.R.D. 338, 350 (N.D. Ill. 2008) (quoting *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 373 (1966)). If that was a necessity, locating a suitable class representative would be nigh impossible. Instead, a class representative must "know the basic facts underlying the lawsuit as alleged in the complaint, and must be willing to participate in discovery." *Id*. Wilkins has met this undemanding standard. The commonality requirement is satisfied.

-24-

c. **Typicality**

Commonality and typicality are closely related. *Wal-Mart*, 131 S. Ct. at 2251 n. 5 ("The commonality and typicality requirements of Rule 23(a) . . . . serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."). A plaintiff must show that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Simpson v. Safeguard Prop., LLC*, No. 13 CV 2453, 2014 WL 4652336, at *4 (N.D. Ill. Sept. 17, 2014) (quoting *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998)).

Just Energy contends that Wilkins' claims are not typical because at her deposition, she testified that she thought that she was an independent contractor, not an employee. A review of the deposition transcript shows that this view appears to be based on her acceptance of Just Energy's classification of her as an independent contractor. Wilkins Dep. at 62:14-65:16. In any event, Wilkins' views about the correctness of Just Energy's classification are irrelevant as typicality is a question for the court, which must consider the uniformity of the defendants' conduct towards the putative class. *See Simpson*, 2014 WL 4652336, at *4. In addition, typicality is not defeated by the putative fact that Wilkins worked during a period of particularly rainy weather. The focus is on Just Energy's policies and practices. The typicality requirement is satisfied.

### d. Adequacy

Rule 23(a) also requires the named plaintiff to "fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4). To meet this standard, the named plaintiff's claims and interests cannot conflict with those of the class, the class representative must have a sufficient interest in the outcome of the case, and class counsel must be experienced and competent. *Kurgan*, 2014 WL 642092, at *7 (citing *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993). The defendants do not contest any of these elements. There is no sign of a conflict, Wilkins has demonstrated that she is sufficiently interested in the outcome of this case as she sat for her deposition and responded to written discovery, and counsel for the putative class appears well-qualified.

### 3. Rule 23(b)

Because Wilkins satisfied Rule 23(a)'s requirements, the court turns to whether she also shown that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b). Just Energy contests both of these elements.

### a. Predominance

Predominance and commonality are related but "the predominance criterion is far more demanding." *Amchem*, 521 U.S. at 624. As the Seventh Circuit has explained:

> Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication. Or, to put it another way, common questions can predominate if a common nucleus of operative facts and issues underlies the claims brought by the proposed class. If, to make a prima facie showing on a

> given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question. Individual questions need not be absent. The text of Rule 23(b) (3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole.

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (internal citations, alterations, and quotation marks omitted).

Assessing predominance "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). The court considers whether the evidence relevant to the elements of that cause of action is common or specific to an individual. William B. Rubenstein, *et al.*, *Newberg on Class Actions*, vol. 2, § 4:50 (5th ed. 2012). The presence of individual questions is not dispositive as "Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Messner*, 669 F.3d at 814. Similarly, the fact that potential damages for individual class members vary is not fatal to a motion for class certification if substantial common issues outweigh individual issues regarding damages. *Id*. Once the court has distinguished between individual and common questions, it then "loosely compares the issues subject to common proof against the issues subject solely to individualized proof to *assess* whether the common issues predominate." *Newberg*, at § 4:50 (emphasis in original).

## I. Predominance – Status as an Independent Contractor Under the IMWL

To determine if an individual is an employee or an independent contractor under the IMWL, courts consider: (1) "the degree of control the alleged employer exercised over the individual," (2) "the extent to which the services rendered by the individual are an integral part of the alleged employer's business," (3) "the extent of the relative investments of the individual and alleged employer," (4) "the degree to which the individual's opportunity for profit and loss is determined by the alleged employer," (5) "the permanency of the relationship," and (6) "the skill required in the claimed independent operation." *Brown v. BCG Attorney Search*, No. 12 C 9596, 2013 WL 6096932, at *2 (N.D. Ill. Nov. 20, 2013) (quoting *People ex rel. Dep't of Labor v. MCC Home Health Care, Inc.*, 790 N.E.2d 38, 41 (Ill. App. Ct. 2003), and 56 Ill. Adm. Code § 210.110). As with the outside salesperson exemption, when deciding if an individual is an independent contractor, decisions interpreting the parallel provision in the FLSA apply equally to cases arising under the IMWL. *See id.* (citing *Villareal v. El Chile, Inc.*, 776 F. Supp. 2d 778, 784 (N.D. Ill. 2011)).

### (a)    Control

"Evidence that reflects the employer's dominance over the manner and method of how work is performed tends to indicate that the individual was an employee under the control of the employer." *Bennett v. Unitek Global Servs., LLC*, No. 10 C 4968, 2013 WL 4804841, at *6 (N.D. Ill. Sept. 9, 2013) (internal quotations marks omitted). Just Energy argues that the predominance requirement is not satisfied because the degree of control exercised over each door-to-door worker must be determined individually. It asserts that the record shows, among other things, that Wilkins used a script and other door-to-door workers did not, and that different offices had different policies about the time that the workday started and ended, number of hours

worked each day, whether workers were dropped off at a specific location by a crew coordinator or could chose their own work location, and whether workers were required to wear clothing bearing Just Energy's name.

Wilkins, on the other hand, stresses that Just Energy had the ultimate power to accept or reject any signed Applications that she might obtain from prospective customers. She also asserts that members of the putative class were required to pass a background check and comply with Just Energy's policies (including the Independent Contractor Manual, which requires them to display a badge and wear Just Energy branded clothing, and sets out rules for wearing hats). Just Energy's policies barred all door-to-door workers from simultaneously working for a competitor. Just Energy provided training, as well as sales and marketing materials. Although not all door-to-door workers followed a script, the workers all imparted similar information about the various programs offered by Just Energy and followed Just Energy's standard practices about the Agreement-signing process, such as using the customer's phone to call a third party verifier and advising new customers that their Agreement will be processed and that they should receive a welcome letter in a few weeks.

As noted by Wilkins, many of the alleged differences between the levels of control over different door-to-door workers are based on whether an individual Just Energy office chose to follow Just Energy's uniform corporate policy. "Although several factors are considered in determining whether an individual is an employee or an independent contractor, the "employer's *right to control* is the most important" in making the distinction." *Brown*, 2013 WL 6096932, at *2 (emphasis added) (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378 (7th Cir. 1991) (analyzing whether a worker was independent contractor or employee under the

-29-

FLSA)). Just Energy does not appear to dispute that management in its individual offices had the *right* to control numerous aspects of the door-to-workers' workdays. Instead, Just Energy emphasizes ways in which management at the individual offices did not cleave to its policies, such as allowing flexibility about the starting time of the workday.

The court finds that despite the modest differences identified by Just Energy, common issues predominate over issues affecting only individual class members. *See Callahan v. City of Chicago*, No. 12 CV 362, — F. Supp. 3d —, 2015 WL 394021, at *16 (N.D. Ill. Jan. 23, 2015) (holding that the City of Chicago's focus on its lack of control over how the plaintiff drove her cab, such as hours, breaks, and how to interact with passengers, was "too narrow" because the City's "right to control" was relevant under the FLSA and the City subjected the plaintiff "to a plethora of rules and regulations . . . that govern the operation of taxicabs as a whole" and "the City can and does enforce those regulations."). Fundamentally, Just Energy's relationship with the door-to-door workers was based on a uniform "independent contractor" agreement. The door-to-door workers were required to follow the rules, policies and procedures set forth in Just Energy's employee handbook, Code of Business Conduct and Ethics Policy, and Compliance Matrix. The "Independent Contractor Manual" details the commission structure, states that wearing workers "must wear" company-branded clothing and cannot wear a cap unless the company's name and logo are visible and the logo faces forward. (Dkt. 46-5 at Part I, 19, 22.)

The manual also sets out "a day in the life of an independent contractor":

Let's look at the components of a typical day as an Independent Contractor. An Independent Contractor typically begins their day in the late morning with a meeting at the office before going on the road. These meetings include updates on regulatory or market information, awards, incentives, products and practicing sales techniques. You also have time to prepare for the on-road part of the day,

ensuring you have all the paperwork. We will focus on the customer interaction part of your day. While the process may vary in different offices, for the most part the steps in the process are the same.

(*Id*. at Part II, 4.) The manual directs the door-to-door workers to "follow . . . Illinois Code of Conduct rules" when "introducing Just Energy products and brochures," and provides a list of information to disclose when meeting a prospect. (*Id*. at 5.) It specifies that the door-to-door workers "will be dropped off by the Crew Coordinator at the location [they] will be working for the day. [The workers] will work from early afternoon until early evening in one area, contacting customers." (*Id*. at 6.) It lists seven mandatory steps to take when making a presentation after knocking on a prospect's door, as well as numerous rules about explaining Just Energy's product and instructions for how to ask a prospect for her current gas bill and convince her to sign an Agreement. (*Id*. at 6, 9-11.) It contains a section aimed at ensuring that door-to-door workers follow specified procedures to avoid legal action by the ICC or the Illinois Attorney General and states that failure to comply will lead to disciplinary action up to and including termination, suspension, or fines. (*Id*. at 29-32.)

These practices all relate to the control that Just Energy had over the door-to-door workers, and all rely on common evidence. As Just Energy puts it in its own manual that it gives to all of its door-to-door workers, "[w]hile the process [for promoting Just Energy's products as a door-to-door worker] may vary in different offices, for the most part the steps in the process are the same." (*Id*. at 4.) "[C]ommon issues need only predominate, not outnumber individual issues." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (internal quotation

marks omitted). Common issues about Just Energy's control over the door-to-door workers predominate.[5]

### (b)       Integral Part of Just Energy's Business

Just Energy does not contest that the "the services rendered by the individual are an integral part of [its] business." *See Brown*, 2013 WL 6096932, at *2. The door-to-door workers all play the same essential role in Just Energy's business: without the workers, Just Energy would have no signed Agreements to consider. This factor supports a finding of predominance.

### (c)       Relative Investments

The next factor relating to control is "the extent of the relative investments of the individual and alleged employer." *See Brown*, 2013 WL 6096932, at *2. Based on the current record, Just Energy appears to be significantly invested in its business in a way that eclipses the investment of the door-to-door workers. This factor supports a finding of predominance.

### (d)       Profit and Loss

The court next considers "the degree to which the individual's opportunity for profit and loss is determined by the alleged employer." *See Brown*, 2013 WL 6096932, at *2. An independent contractor is at risk of losing her investment and can increase her profits through

---

[5] As noted above, crew coordinators are experienced door-to-door workers who have some degree of supervisory authority over the line door-to-door workers. It appears that they receive a percentage of the commissions of the workers they supervise. The record does not indicate any other way that their relationship with Just Energy differs from that of the line door-to-door workers. In the *Hurt* case, Just Energy argued that the "job duties varied for certain Plaintiffs who worked as 'crew coordinators,'" but the court found that the predominance requirement was satisfied because "those difference are not of such a magnitude as to cause individual issues to predominate. *Hurt*, 2013 WL 4427255, at *5. If Just Energy believes that the control element for crew coordinators would be established by substantially different proof, it may file an appropriate motion.

"managerial discretion." *Perez v. Super Maid, LLC*, No. 11 C 07485, 2014 WL 3512613, at *6

(N.D. Ill. July 14, 2014). "Strict prearranged pay scales and situations that do not afford workers

'managerial discretion' to adjust their hours or work more efficiently eliminate the opportunity

for those workers to realize increased profits by adjusting their own performance." *Id.* (quoting

*Solis v. Intern. Detective & Protective Serv., Ltd.*, 819 F. Supp. 2d 740, 748 (N.D. Ill. 2011)).

The commission system is based on volume; workers can increase their pay by

convincing more prospects to sign Agreements. The system thus rewards zealous workers who

knock on more doors in a given workday and who have a more polished pitch. Door-to-door

workers can also rise to the level of a crew coordinator (or higher). Thus, there are opportunities

to increase profits through skill that are not tied to Just Energy's rules. These individualized skill

levels are inherently person-specific. In contrast, at least some workers are led by crew

coordinators who drive the workers to and from neighborhoods in a van at set hours. These

workers cannot control the number of hours that they work. Moreover, as Wilkins stresses, Just

Energy has the right to accept or reject a signed Agreement procured by a door-to-door worker

and thus has the ultimate ability to control a worker's commissions.

Thus, it appears that commissions are influenced by factors outside Just Energy's control

(such as weather, the ultimate ability to convince prospects to sign Agreements, and the

creditworthiness of prospects), as well as under Just Energy's control (such as training and

whether it decides to accept an Agreement). Some of these factors can be established by

common evidence and some cannot. The difference between success and failure as a door-to-

door worker appears to be substantially tied to the ability to work efficiently and effectively in

order to convince prospects to sign Agreements. This is an individualized inquiry to the extent

that it is based on innate ability and a common inquiry to the extent that it is based on training and support provided by Just Energy. In contrast, the number of pre and post-flow cancellations is another significant factor that affects commissions. This inquiry depends on Just Energy's actions and affects the entire putative class equally. The opportunity for profit or loss element, therefore, slightly favors Wilkins.

### (e)    Permanency of the Relationship

The fifth criterion for determining if an individual is an employee or an independent contractor under the IMWL is the "degree of permanency and duration of the working relationship." *See Brown*, 2013 WL 6096932, at *2. "Permanency suggests that the worker is economically dependent on the putative employer." *Callahan*, 2015 WL 394021, at *16. In the *Hurt* case against a different Just Energy entity that was filed in federal court in Ohio, Richard Teixeira (the defendants' Rule 30(b)(6) witness in that case) testified that door-to-door workers have a "high turnover rate." *See* Teixeira Dep. at 95:15-20. Just Energy objects to the use of evidence submitted in the *Hurt* case. It does not, however, point to any evidence suggesting that a substantial percentage of door-to-door workers generally enjoyed long careers with Just Energy. The fact that a few workers, such as putative class member Goldman, rose from the ranks of line door-to-door workers to earn a salary of over $80,000 one year and two other door-to-door workers "have been affiliated with Just Energy for years," (Dkt. 56 at 17), does not refute Wilkins' claim that as a general rule, the position of door-to-door worker had a high turnover rate.

Generally, a longer term relationship makes it more likely that a worker is an employee. *Perez*, 2014 WL 3512613, at *7. It appears that most door-to-door workers did not have a

lengthy relationship with Just Energy. Wilkins asserts that this is due to the commission structure. The parties do not explain how permanency or the lack thereof relates to predominance for the purposes of a motion for class certification. The court declines to craft arguments for them and thus moves on to the final criterion differentiating an independent contractor from an employee.

#### (f)    Specialized Skill

How much specialized skill is necessary to perform the job of door-to door worker? "Although certain highly specialized job skills support independent contractor classification, '[s]kills are not the monopoly of independent contractors,' as all jobs require some modicum of skill." *Perez*, 2014 WL 3512613, at *6 (quoting *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987)). It is undisputed that Just Energy did not require door-to-door workers to have any prior sales experience. Although the workers needed to be able to learn how to follow Just Energy's instructions, the lack of any sales prerequisite applies equally to all door-to-door workers and thus can be established using common proof.

#### (g)    Balancing of The Independent Contractor Elements

Based on all of the elements discussed above, it appears that the independent contractor versus employee issue will be resolved based largely on common evidence. If that is so, common questions of law and fact will necessarily predominate over individual questions. *See Messner*, 669 F.3d at 815 ("Individual questions need not be absent . . . . [Rule 23(b)(3)] requires only that those questions not predominate over the common questions affecting the class as a whole."). The present record indicates that Just Energy's actions relating to the putative class

members are sufficient to generate a common answer to the question of whether the door-to-door workers are independent contractors or employees. *See Wal-Mart*, 131 S.Ct. at 2551.

This is true despite Just Energy's contention that the damages claimed by the members of the putative class vary. As discussed above, the fact that the potential damages for individual class members may differ does not, by itself, support the denial of plaintiffs' motion for class certification. *See Messner*, 669 F.3d at 819 ("common proof of damages for class members . . . is not required"); *Butler*, 727 F.3d at 801 ("[i]f the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification"); *see also Newberg*, *supra*, at § 4:54 (ordinarily, "individual damage[s] calculations should not scuttle class certification under Rule 23(b)(3)").

While the potential damages payable to each member of the putative class will likely differ, the methodology used to calculate damages will remain the same. *See Comcast*, 133 S. Ct. at 1430 (internal quotations omitted) (the predominance requirement required respondents to show that their damages "were measurable on a class-wide basis through use of a common methodology"); *Arreola v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008) ("Although the extent of each class member's personal damages might vary, district judges can devise solutions to address that problem if there are substantial common issues that outweigh the single variable of damages amounts.").

Just Energy also contends that the lack of records memorializing how many hours each door-to-door worker spent on the job means that damages are unascertainable. "[U]nreported

time for each employee could be reconstructed from memory, inferred from the particulars of the jobs the [workers] did, or estimated in other ways – any method that enables the trier of fact to draw a 'just and reasonable inference' concerning the amount of time the employee had worked would suffice." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 775 (7th Cir. 2013) (quoting *Urnikis-Negro v. American Family Prop. Servs.*, 616 F.3d 665, 669 and n.2 (7th  Cir.2010)); *see also Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).  The absence of records is, therefore, not a bar to class certification.  *See Butler*, 727 F.3d at 801 ("[i]f the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.").  Thus, Direct Energy's arguments about damages do not affect the court's conclusion that the predominance requirement has been satisfied as to the independent contractor versus employee distinction.

### ii.     Predominance – The IMWL's Outside Salesperson Exemption

As noted above, under the IMWL, an outside salesperson is "regularly engaged in making sales or obtaining orders or contracts for services where a major portion of such duties are performed away from his employer's place of business."  820 Ill. Comp. Stat. § 105/3(g). Turning to FLSA precedent, the "external indicia of salesmen" includes whether individuals "were hired for their sales experience," were "trained to close each sales call by obtaining the maximum commitment possible," "worked away from the office, with minimal supervision," and "were rewarded for their efforts with incentive compensation." *Christopher*, 132 S.Ct. at 2172-73.

Just Energy asserts that, as with the independent contractor exception, these factors turn on individualized inquiries. As discussed above, the court disagrees. Moreover, as noted above in connection with Just Energy's motion for summary judgment, the class in *Christopher* is distinguishable from the putative class in this case; the door-to-door workers are paid on a pure commission basis, while the pharmaceutical representatives in *Christopher* are salaried, earn well over the minimum wage, and perform non-routine work that cannot be readily spread over a pool of other workers. *Id*. at 2173. The predominance requirement has been satisfied as to the outside salesperson exemption.

### b.    Superiority

Finally, the court must consider whether the proposed class action is superior to other methods available for resolving the claim. *See* Fed. R. Civ. P. 23(b)(3). Four factors are relevant: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). The superiority requirement is satisfied when "a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Driver v. AppleIllinois, LLC*, 265 F.R.D. 293, 304 (N.D. Ill. 2010) (quoting *Amchem*, 521 U.S. at 615).

Wilkins champions the superiority of a class action based on her contention that Just Energy's door-to-door workers have a high turnover rate. Wilkins reasons that individuals like

her, who worked for Just Energy for a short time, have little incentive to seek redress since their damages would be minimal. Thus, she concludes that a class action is the best way to vindicate the rights of the putative class. In response, Just Energy asserts that it is difficult to envision how a class action could be managed in light of the differing levels of control over the door-to-door workers, the door-to-door worker's differing levels of adherence to control that the Crew Coordinators attempted to assert over them, and the differing damages claimed by the members of the putative class based on the actual hours that they worked.

The court has already found that Just Energy had the ability to control the door-to-door workers. And as discussed above, Just Energy's own manual for the door-to-door workers states that "[w]hile the process [for promoting Just Energy's products as a door-to-door worker] may vary in different offices, for the most part the steps in the process are the same." (Dkt. 46-5 at Part II, 4.) This is not the first class action where the members of the putative class will, if they prevail, be entitled to differing amount of damages. The court agrees with the *Hurt* court's conclusion that whether the members of the putative class qualify as outside salespeople or independent contractors "can be answered on a classwide basis and are not individual issues as Defendants say they are. Here, the issue is not the minor individual differences between the [members of the class], but rather the Defendants' uniform treatment of [them] as exempt independent contractors [and outside salespeople] – both liability and defenses to liability will be appropriately made on a classwide basis." *Hurt v. Commerce Energy, Inc.*, No. 1:12-CV-758, 2014 WL 3735460, at *2-3 (N.D. Ohio July 28, 2014) (order denying defendants' motion to decertify).

-39-

The Seventh Circuit directs this court to consider the ultimate question of "whether classwide resolution would substantially advance the case." *Suchanek*, 764 F.3d at 761 (citing *Butler*, 727 F.3d at 801-02). It appears that many door-to-door salespeople had short careers with Just Energy. A class action satisfies Rule 23(b)(3)'s superiority requirement "when many individuals have small damage claims . . . because absent a class suit, it is unlikely that any of the claimants will be accorded relief." *Newberg*, *supra*, at § 4:64; *see also Amchem*, 521 U.S. at 617. The court finds that it would be inefficient and impractical to adjudicate liability numerous times and that the existence of individualized damages claims does not preclude class certification. *See Kurgan*, 2014 WL 642092 at *9 (citing *Butler*, 727 F.3d at 801). The proposed class meets the superiority requirement for certification under Rule 23(b)(3).

## IV.  CONCLUSION

Plaintiff Levonna Wilkins' motion for leave to submit supplemental authority in support of her opposition to the defendants' motion for summary judgment [83] is granted. The defendants' motion for summary judgment [57] is denied. Wilkins' motion to certify a class [40] is granted. The court certifies a class consisting of all persons since August 14, 2010 who: (a) were Illinois residents; (b) were listed on their Just Energy contract as performing services for Just Energy; (b) were treated as independent contractors; (c) had the job of going door-to-door for Just Energy; and (d) were not paid minimum wage and/or overtime." A status hearing is set for April 3, 2015 at 9:30 a.m.


Date:  March 13, 2015                              _____/s/_____
                                                   Joan B. Gottschall
                                                   United States District Judge