**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Levonna Wilkins, on Behalf of Herself and All Other Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 13-CV-5806 |
| v. | ) ) | Honorable Joan B. Gottschall |
| Just Energy Group Inc., Just Energy Illinois Corp., Commerce Energy, Inc., and Just Energy Marketing Corp., | ) ) ) ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

In this certified class action, plaintiff Levonna Wilkins ("Wilkins") claims that defendants misclassified her and class members as independent contractors and outside salespersons in violation of the Illinois Minimum Wage Law ("IMWL"), 820 Ill. Comp. Stat. § 105/1, *et seq.* Following years of discovery, defendants have filed two motions seeking reconsideration of portions of this court's March 13, 2015, opinion, *Wilkins v. Just Energy Grp., Inc.* ["*Wilkins I*"], 308 F.R.D. 170, 180 (N.D. Ill. 2015), modified in part on reconsideration 171 F. Supp. 3d 798 (N.D. Ill. Mar. 22, 2016) ["*Wilkins II*"], further reconsideration denied 2016 WL 3345526, N.D. Ill., June 16, 2016) ["*Wilkins III*"]. The first motion asks the court to decertify the class. The second, filed approximately five months later, asks the court to reconsider the denial of summary judgment in light of *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (Apr. 2, 2018) and *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219 (2nd Cir. Sep. 19, 2018). For the following reasons, the court denies both motions.

## Background

A detailed recitation of the factual and procedural background at summary judgment can be found in the March 2015 opinion. *See Wilkins I*, 308 F.R.D. at 173–77. Recapping briefly, "Defendant Just Energy Group hires individuals to go door-to-door on behalf of affiliated entities. . . .The primary objective of these workers is to convince prospects to sign up for Just Energy Illinois' Natural Gas RateFlex and Just Green programs." *Id.* at 173–74.

The customer enrollment process worked as follows. First the prospect signed a RateFlex customer agreement and written disclosures presented by the "door-to-door worker." *Id.* at 174, 175 (quoting agreements). The worker then would call a third-party verifier, using the prospect's phone, and the verifier, who was not allowed to explain the program, confirmed that the customer agreed to switch to Just Energy Group ("Just Energy"). *Id.* at 175.

In the field, door-to-door workers generally wore apparel with "Just Energy" logos, though the record was not entirely clear on whether Illinois law required them to wear more than a Just Energy badge. *See id.* at 175. "A crew coordinator employed by Just Energy Illinois decided where Wilkins would work and what time she would go home, and transported Wilkins and other door-to-door workers to and from their daily work locations in a van." *Id.*; *but see id.* (noting Just Energy's contentions that workers could set out on their own in the field).

Wilkins received two days of initial training and further opportunities to hone her abilities to "close the deal" through roleplaying. *Id.* at 174. "When at potential customers' doors, Wilkins recited the sales script, asked the prospects for a copy of their utility bill to see if they were eligible for the program, explained the program and the cancellation policy, and attempted to get the prospects to sign Agreements." *Id.* at 175.

2

Workers such as Wilkins were paid commissions based on how many customers they enrolled, for what services, and on how long the customer remained enrolled. *See id.* at 175. They did not receive commissions for cancelled applications, however. *Id.* Cancellations could occur for a variety of reasons beyond the worker's control, including cancellation by Just Energy, which reserved the right to cancel applications at its discretion. *Id.* Just Energy took the position at summary judgment that it generally cancelled agreements for a specific reason, "such as poor credit." *Id.* Summary judgment evidence showed that the Westmont office, out of which Wilkins was based, had a 8.33% discretionary cancellation rate in 2012 and a 5.13% discretionary cancellation rate in 2013. *Id.*

Defendants' motion for summary judgment was denied because there were genuine factual disputes material to whether Wilkins qualified for the IMWL's exemption for an "outside salesperson." 820 Ill. Comp. Stat. § 105/3(c). *See Wilkins I*, 308 F.R.D. at 177–83. The court also certified a class over numerous objections from defendants. *See id.* at 183–91.

As this court has previously described its ruling:

> Given the number of cancellations, the court concluded that fact questions existed about whether the door-to-door workers who obtained Agreements were within the ambit of the IMWL, 820 Ill. Comp. Stat. § 105/3(g), because they made sales or obtained orders or contracts for services. The court also questioned whether door-to-door workers like Wilkins regularly made sales or obtained orders given that she did not obtain any signed Agreements and door-to-door workers generally had a high turnover rate, despite evidence in the record showing that a few door-to-door workers were successful. *See id.*

Order 2, Mar. 22, 2016, ECF No. 118.

## Reconsideration Standard

This marks the second time defendants have sought reconsideration of summary judgment, First Mot. to Reconsider, ECF No. 108, and class certification, ECF No. 92. *See also* Order, Mar. 22, 2018, ECF No. 118 (separate order denying motion to reconsider denial of

3

summary judgment). The court has the inherent authority to reconsider its interlocutory orders because such orders "may be revised at any time before the entry of judgment adjudicating all the claims." *See* Fed. R. Civ. P. 54(b); *see also Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012) (Rule 54(b) provides that non-final orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). A motion to reconsider an interlocutory order serves a limited purpose in federal litigation; it is not a vehicle to rehash an argument the court has already rejected or to present legal arguments that were not presented earlier. *Schilke v. Wachovia Mortg., FSB*, 758 F. Supp. 2d 549, 554 (N.D. Ill. 2010). Rather, a motion to reconsider allows a party to direct the court's attention to manifest errors of fact or law, a significant change in the law or facts, the court's misunderstanding of a party's argument, or party's contention that the court ruled on an issue that was not properly before it. *See United States v. Ligas*, 549 F.3d 497, 501 (7th Cir. 2008).

### Sequence of Rulings

Defendants urge the court, in the name of "judicial economy," to stay their motion to decertify and first decide whether *Encino Motorcars* and *Flood* require entry of summary judgment in their favor. Mem. Supp. Mot. to Reconsider Summ. J. 9, ECF No. 195. By separate order, ECF No. 201 (Feb. 13, 2019), the court raised the possibility that sequencing rulings in this way was at odds with the principles undergirding the rule against one-way intervention. *See generally Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1057–58 (7th Cir. 2016); *Peritz v. Liberty Loan Corp.*, 523 F.2d 349, 354 (7th Cir. 1975). The court gave plaintiff an opportunity to brief this and other issues raised by the motion to reconsider. ECF No. 201 at 3. Plaintiff filed her response in which she states that she agrees that the court should decide the motion to reconsider summary judgment first. Resp. to Mot. to Reconsider 2, ECF No. 206. Accordingly, plaintiff

has waived any objection to deciding the motion to reconsider before the motion for class certification. *Cowen v. Bank United of Tex., FSB*, 70 F.3d 937, 941–42 (7th Cir. 1995) (holding parties may waive objections under the rule against one-way intervention).

## Summary Judgment

The defendants base their motions for reconsideration on two cases decided in 2018, *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018) and *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219 (2nd Cir. 2018). *Encino Motorcars* considered a different exemption under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, but the Court rejected "as a useful guidepost" the general "principle that exemptions to the FLSA should be construed narrowly." *Encino Motorcars*, 138 S. Ct. at 1141 (citation omitted). Instead, the Court held that FLSA exemptions must receive a "fair reading." *Id.* at 1142.

This court's summary judgment ruling did not turn on any general principle of statutory construction reading IMWL exemptions (or cognate FLSA exemptions) narrowly, however. *See Wilkins I*, 308 F.R.D. at 178–83. Indeed, the leading Illinois case on the exemption which this court discussed extensively at summary judgment applies statutory rules compatible with *Encino Motorcars*. *See DeWig v. Landshire, Inc.*, 666 N.E.2d 1204, 1206 (Ill. App. Ct. 3d Dist. 1996) (construing IMWL "outside salesperson" exemption and stating that "rules of strict or liberal construction have no application where the language of a statute is clear"). The summary judgment quoted a Seventh Circuit case applying the narrow construction principle, but it was cited for its holding on the separate question of which party has the burden of showing that an FLSA exemption applies. *See id.* at 178 (quoting *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631 (7th Cir. 2010)). Defendants do not ask the court to reconsider its decision on the burden of proof issue, and they do not argue that *Encino Motorcars* overturned the "general

5

rule," applied by this court, that "the employer bears the burden of proof when claiming that a FLSA exemption applies." *Id.* (quoting *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 93 (2008)). In any event, even if plaintiff did bear the burden of proof on this issue, the fact issues identified by the court would still require denial of summary judgment. Accordingly, *Encino Motorcars'* principle for construing FLSA exemptions does not by itself warrant reconsideration.

Defendants also contend that *Flood's* analysis of the FLSA "outside salesperson" exemption undermines this court's summary judgment analysis and warrants reconsideration. *Flood* affirmed summary judgment for Just Energy-related entities on FLSA and New York wage and hour claims brought by a group of plaintiffs who went door-to-door under conditions similar to those experience by Wilkins and members of the class here. *See* 904 F.3d at 224–26. The lead plaintiff, Kevin Flood, worked for Just Energy for three years going door-to-door in an effort to enroll new Just Energy customers. *See id.* The plaintiffs were paid by commission, and they, like the plaintiffs here, were driven by Just Energy employees each day to a residential neighborhood and fanned out to sign up customers. *See id.* Just Energy similarly retained the discretion to cancel contracts after a third party verified the prospect's enrollment, and the door-to-door worker had no control over Just Energy's cancellation decision. *Id.* at 225–26.

The Second Circuit acknowledged that the case arose "in the context of growing division among district courts elsewhere in the country about whether Just Energy's door-to-door solicitors fall within the scope of the outside salesman exemption under the FLSA and cognate state labor laws." *Id.* at 226 (citing example cases). Relying expressly on *Encino Motorcars'* "fair reading" principle, the *Flood* court held that there were no material fact issues and that the FLSA's "outside salesman," 29 U.S.C. § 213(a)(1), exemption applied to the plaintiffs. *Flood*, 904 F.3d at 228–36 & n.7. As for the plaintiffs' claims under New York labor laws, the Second

Circuit affirmed their dismissal because the plaintiffs relied on a New York statute requiring employers to pay timely weekly wages, NYLL § 191(1)(a), and the undisputed evidence showed that the plaintiffs had agreed to be paid by commission.  *Id.* at 238.

As the plaintiffs here point out, *Flood* does not bind this court; it ranks as persuasive authority.  *See* Resp. to Mot. to Reconsider 2, ECF No. 206.  The court has no quarrel with the general proposition that, "[p]articularly in evolving areas of the law such as this one, new cases (which add weight to one side or the other of an ongoing debate) are handed down regularly. Though changes in binding authority require reconsideration of prior rulings in an ongoing case, it would result in unnecessarily protracted litigation and judicial inefficiency if courts regularly reconsidered prior rulings based merely on new, potentially persuasive case law."  *Shidler v. Moore*, 2008 WL 553177, at *1 (N.D. Ind. Feb. 27, 2008).  *Flood* cannot be so easily disregarded.  *Flood* is the first of several cases around the country to reach a court of appeals, something the *Flood* court acknowledged.  904 F.3d at 227.  The Seventh Circuit has directed district courts to "give most respectful consideration to the decisions of the other courts of appeals and follow them whenever [they] can."  *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987).  But this does not mean a district court may defer mechanically to other circuits or abdicate its duty independently to decide a legal question.  *See Atchison, Topeka & Santa Fe Ry. Co. v. Pena*, 44 F.3d 437, 443 (7th Cir. 1994) (en banc), *aff'd sub nom. Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe R.R. Co.*, 516 U.S. 152 (1996); *Citizens for a Better Env't v. Steel Co.*, 230 F.3d 923, 927–928 (7th Cir. 2000); *Colby*, 811 F.2d at 1123.  *Flood* deserves some heightened deference—the Seventh Circuit has described it as "in between some deference and complete deference"—because the plaintiffs here and in the Second Circuit "challenge the same practice of the same defendant" and "different outcomes would place the

7

defendant under inconsistent obligations." *Colby*, 811 F.2d at 1124; *but see id.* (explaining that district courts should not give this sort of deference to the decisions of other district courts, particularly out-of-circuit district courts). This court must take a serious look at the persuasive value of *Flood* before imposing arguably different obligations on defendants.

Plaintiffs argue that *Flood* is inapposite because it interprets the FLSA rather than the IMWL. Throughout this litigation, the court has applied cases stating that "the IMWL parallels the FLSA so closely, courts have generally interpreted their provisions to be coextensive, and so have generally applied the same analysis to both." *Wilkins I*, 308 F.R.D. at 178 (quoting *Callahan v. City of Chicago*, 78 F. Supp. 3d 791, 821 (N.D. Ill. 2015)), *aff'd* 813 F.3d 658 (7th Cir. 2016); ECF No. 118 at 2; *Wilkins II*, 171 F. Supp. 3d at 802; *Wilkins III*, 2016 WL 3345526, at *4. Even so, this court's summary judgment analysis began by making clear that the court was predicting how the Illinois Supreme Court would rule on the issue. *Wilkins I*, 308 F.R.D. at 179 (citing *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 936 (7th Cir. 2012)). The court discussed *DeWig,* an IMWL case, at length because defendants characterized it as "the leading case applying the outside sales exception under the IMWL." *Id.* (quoting brief). This court distinguished *DeWig* on its facts and because "the majority's analysis is at odds with analogous FLSA cases." *Id.* On reconsideration, this court took the same approach, treating the IMWL and FLSA questions as coextensive: "the court need not delve into the differences, if any, between California and Illinois law" on the exemption at issue (discussed in district court cases cited by defendants). ECF No. 118 at 4. *Flood* is another analogous FLSA case. So considering

*Flood* accords with this court's consistent approach to the IMWL.[1] *See Wilkins I,* 308 F.R.D. at 180–81.

Turning to *Flood's* FLSA analysis, it continues to be distinguishable on the facts here. Notably, the district court in *Flood* distinguished *Wilkins I* without extensive discussion. The district court in *Flood* stated that it sided with other district court cases (cases which this court has previously distinguished, *see* ECF No. 118 at 4) "[t]o the extent the cases conflict." *Flood v. Just Energy Mktg Corp.*, 2017 WL 280820, at *6 (S.D.N.Y. Jan. 20, 2017).[2] The Second Circuit mentioned other district court cases but did not expressly distinguish the decisions in this case.

Some of the genuine factual disputes here involve questions left open in *Flood*. In discussing *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2161 (2012), the Second Circuit observed that the plaintiff did "not point to any peculiarity of the utility or energy industry that should warrant a more restrictive application of the term 'making sales' for purposes of the outside salesman exemption." *Flood*, 904 F.3d at 231. The plaintiffs made the argument here, however, and this court concluded that the responsibilities of the plaintiffs in *Christopher* "are completely different than the responsibilities of Just Energy door-to-door workers." *Wilkins I*, 308 F.R.D at 181. Additionally, there were no disputes "about the range of commissions earned by door-to-door workers" in *Flood*. *Compare id.*, *with Flood*, 904 F.3d at 234 (noting that it was undisputed that the plaintiff made over $80,000 a year in commissions and that he did "not argue[ ]. . .that if his door-to-door activities involved 'making sales,' then these activities were not his primary duty as a Just Energy employee"); *see also Hurt v.*

---

[1] Plaintiffs make their argument regarding the different sources of law in nearly conclusory fashion. *See* Resp. to Mot. to Reconsider 5. Since they point to no case distinguishing the IMWL and FLSA exemptions based on their text, they have not adequately developed the issue, and so it is waived.

[2] The court has employed short citations to make clear when it is citing the Second Circuit's opinion in *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219 (2nd Cir. Sep. 19, 2018) and the district court's opinion in *Flood v. Just Energy Mktg Corp.*, 2017 WL 280820, at *6 (S.D.N.Y. Jan. 20, 2017).

*Commerce Energy,* 2018 WL 4203531, at *2 (N.D. Ohio Sept. 4, 2018) (holding that these issues remained relevant after *Encino Motorcars*).

Because the fact issues that precluded summary judgment implicate questions conceded by the litigants or not argued in *Flood*, this court, after careful consideration, does not believe *Flood* demonstrates the manifest error required for reconsideration. Defendants' motion for reconsideration is therefore denied.[3]

### Motion to Decertify

Defendants' motion to decertify the class dovetails with their "outside salesperson" exemption arguments made in their motion to reconsider the entry of summary judgment. The IMWL defines an "outside salesman" as one who is "regularly engaged in making sales or obtaining orders or contracts for services where a major portion of such duties are performed away from his employer's place of business." 820 Ill. Comp. Stat. § 105/3(g).

In an analysis informed by *Encino Motorcars* and *Flood*, defendants maintain that the testimony of ten class members expected to be called at trial demonstrates that common issues do not predominate. That is so, say the defendants, because the testimony diverges irreconcilably on issues relevant to whether the class members qualify for the "outside salesperson" exemption and whether they were independent contractors. Finally, defendants urge the court, in the alternative, to decertify the damages class because the parties have agreed to bifurcate the trial into a liability phase followed by a damages phase, if any.

Plaintiffs respond that the differences in testimony are immaterial and that the relevant issues remain susceptible to common proof at trial. They argue that decertification of a damages class is premature. The court agrees.

---

[3] Defendants argue in reply that this court should stay this case pending the Sixth Circuit's decision on appeal in *Hurt*. ECF No. 207 at 9. Arguments made for the first time in a reply are waived.

10

### A. Predominance Standard

As it has in its prior opinions, the court begins with what must be established to demonstrate predominance:

> [Federal Rule of Civil Procedure] 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication. Or, to put it another way, common questions can predominate if a common nucleus of operative facts and issues underlies the claims brought by the proposed class. If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question. Individual questions need not be absent. The text of Rule 23(b) (3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole.

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (internal citations, alterations, and quotation marks omitted).

### B. Predominance: *Encino Motorcars* and *Flood*

Defendants first argue that *Encino Motorcars* and *Flood* warrant decertification. Neither case applied or discuss class certification standards. *See Flood*, 2017 WL 280820 (S.D.N.Y. Jan. 20, 2017) (district court opinion; denying motion to certify class as moot without analysis). As defendants rightly point out, however, both cases can inform the predominance analysis insofar as they delineate the elements of the claims and defenses under consideration. *See Messner*, 669 F.3d at 817 (stating that analysis of predominance under Rule 23(b)(3) "begins, of course, with the elements of the underlying cause of action") (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011)).

Nonetheless, this court has already determined that neither *Encino Motorcars* nor *Flood* altered what must be proven at trial here. The defendants claim that *Encino Motorcars*' "fair reading" principle alters how the IMWL's "outside salesperson" exemption should be analyzed.

11

According to defendants, the court engrafted a requirement that a sale be consummated into the exemption—a requirement that is supposedly at odds with *Encino Motorcars* and *Flood*. *See* Reply to Mot. to Decertify 3, ECF No. 193. As this court explained, *supra*, however, the summary judgment and certification decisions were grounded in the leading Illinois case interpreting the IMWL's "outside salesperson" exemption according to its "plain meaning." *DeWig*, 666 N.E.2d at 1206 (rejecting plaintiffs' request to construe the exemption generously in favor of the employee). The Illinois appellate court's construction of the exemption accords with *Encino Motorcars'* "fair reading" principle.

Additionally, this court has never held that sales must always be "consummated" for the exemption to apply. The closest this court has come is to observe, as part of a matrix of facts, the defendants' "unlimited authority to reject agreements" post-flow. *Wilkins I*, 308 F.R.D. at 180. If the court had adopted a per se rule, there would have been no need to distinguish this case based on the high cancellation rate or to compare the situations of class members such as Wilkins, who did not receive commissions, and those who did. *See Wilkins I*, 308 F.R.D. at 179–80 (denying summary judgment in part because fact issues existed on "the *range of commissions* earned by door-to-door workers" (emphasis added)). Defendants' argument to the contrary is a red herring. For these reasons, neither *Encino Motorcars* nor *Flood* alters the elements of the exemption or the independent contractor defense considered at class certification. Consequently, neither case requires decertification.

### C. Predominance: Testimony of Class Members

Defendants next highlight several differences in the testimony of the ten class members likely to be called at trial. *See* Mem. Supp. Mot. Reconsider 4–12. They contend that these differences raise four fact questions that will not be susceptible to common resolution at trial: (1)

"whether a door-to-door worker who does not obtain a contract qualifies for the exemption;" (2) what is the cancellation rate of contracts after door-to-door workers obtained them; (3) whether workers whose tenures were short and "unremunerative" regularly made sales or obtained orders; and (4) how much control Just Energy exerted over door-to-door workers. *See id.* As a threshold matter, to the extent defendants challenge the means by which plaintiffs will prove their claims at trial, they take the wrong approach. Class certification, and decertification, should not be "a dress rehearsal for the trial on the merits." *Messner*, 669 F.3d at 811 (citations omitted); *but see Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (stating that "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action") (quotation omitted).

### *1. Class Members Descriptions of their Duties and Comparisons to Other Workers*

Defendants build their first argument on the class members' subjective characterizations of how their performances compared to their peers and, at a high level, of what they did. Some class members used the words "sale" or "sell" to describe what they were doing. *E.g.,* Gordiyo Dep., ECF No. 176-1 Ex. A. Others described the role as "register[ing]" potential customers, Mincheski Dep., ECF No. 176-4 Ex. D, or "spark[ing]" an interest in the services, Stanke Dep., ECF No. 176-10 Ex. J. S*ee also* Phillips Dep., ECF No. 176-8 Ex. H (arguably characterizing activities as both selling and registration).

Comparing herself to her peers, class member Lamb, for example, believed that she was in the middle of the pack as to sales; she earned approximately $15,000 a year in commissions. Lamb Dep., ECF No. 176-3 Ex. C. Class member Geleziunas testified that his earnings of approximately $60,00 in 2010 and 2011 made him the best salesperson Just Energy had. Geleziunas Dep., ECF No. 176-5 Ex. E.

13

The differences defendants highlight do not warrant reconsideration because subjective characterizations do not control the "outside salesperson" exemption inquiry. More important than how class members characterized their work will be a functional analysis of what they did in light of all the facts. *See Wilkins I*, 308 F.R.D. at 179–80 (quoting *DeWig,* 666 N.E.2d at 1206, which focused on job "function" and employee's "daily activities"); *Austin v. CUNA Mut. Ins. Soc'y*, 240 F.R.D. 420, 429 (W.D. Wis. 2006); *Schneider v. Ecolab, Inc.*, 2016 WL 7840218, at *6 (N.D. Ill. Sept. 2, 2016) (recognizing that what class members "do on a day-to-day basis" was the pertinent question); *see also* 29 C.F.R. § 541.500(a)(1) (inquiry focuses on employee's "primary duty"). Defendants rely primarily on *Schneider*, in which the plaintiff produced insufficient evidence to demonstrate that district directors and salespersons had similar enough day-to-day duties to warrant certification of a class on the "outside salesman" exemption. *See Schneider*, 2016 WL 7840218, at *4–6. But as chronicled, *infra*, and in the court's prior opinions, whether the class members here describe their duties as registering people, sparking curiosity, or selling services, there is no indication that they diverge on what they did, functionally, on a day-to-day basis such that common questions do not predominate.

## 2. Control Over Cancellation Rates

Defendants also point to purported differences among the class members' control over their cancellation rates. According to defendants, Wilkins testified that cancellation rates were completely out of her control while other class members testified that they had substantial control over cancellation rates. Defs.' Mem. Supp. Mot. to Decertify 8–10 (quoting depositions). The testimony on which defendants rely differentiates post-flow from pre-flow cancellations. Pre-flow cancellations occur before the contract reaches Just Energy's systems, such as at the verification stage. *Wilkins I*, 308 F.R.D. at 177. Defendants quote extensively from the

14

deposition of class member Phillips who testified that he had some control over pre-flow cancellation rates, where "the [verification] phone call ended or the customer didn't understand," but he had no control over post-flow cancellation rates if the "utility [does not allow] the service due to a credit check or other reasons." Phillips Dep. 56:3-2. Wilkins similarly testified that she could not control post-flow cancellations. *See* Wilkins Dep. 7, 314–15, ECF No. 176-13 Ex. M (testifying that she could not control what happened "if [prospects] cancel. . . .[or] [i]f their credit didn't go through."). The other two class members' depositions cited by defendants refer to post-flow cancellations; neither deponent suggested that the door-to-door worker had any control over post-flow cancellations. *See* Mincheski Dep. 63:3-1; Gordiyo Dep. 129:1-1.

This court differentiated expressly between pre- and post-flow cancellation rates in *Wilkins I* and held that the material fact issues bore on the post-flow rates. *Wilkins I*, 308 F.R.D. at 180 ("[P]ost-flow cancellations are outside the control of the door-to-door workers."). The class member testimony to which defendants point does not change the court's conclusions on whether common questions predominate regarding post-flow cancellation rates.

### 3. Tenure, Performance, and Earnings

Defendants frame their third issue in terms of whether class members with short tenures, such as Wilkins, regularly made sales or obtained orders. Defendants point to the testimony of two class members who made sales on their first day of work. Gordiyo Dep. 136:2-21; Gonzalez Dep. 104:11-22, ECF No. 176-2 Ex. B. Other class members testified that they got better at making sales over time. *See, e.g.,* Fuller Dep. 84:9-16, ECF No. 176-6 Ex. F (class member worked with Wilkins for at least some time); Lamb Dep. 74:3-9 (class member got better at overcoming prospects' objections); Glidden Dep. 49:18-5, ECF No. 176-9 Ex. I (class member became faster and more effective as he gained experience); Goldman Dep. 59:23-60:5, ECF No.

15

176-11 Ex. K (deponent started slowly and earned thousands after a few weeks); *but see Wilkins I*, 308 F.R.D. at 180 (noting that class member Goldman worked as a supervisor and that his commissions may therefore not be very typical). Some class members cited their skill in making sales and motivation as factors in success. *See, e.g.*, Glidden Dep. 43:13-44:1 (class member researched competitors to become more effective).

According to defendants, the class members will be pitted against one another at trial. The jury will be forced to "arbitrarily determine who of these ten class members is representative" when performing the "outside salesperson" analysis. Mem. Supp. Mot. to Decertify 20, ECF No. 176. But plaintiffs have shown that these issues are susceptible to class-wide proof in a way that will drive this case's resolution. Defendants argue as though class members' testimony will be the only evidence from which the jury can make its determination. But plaintiffs propose to rely on defendants' pay records, which have been produced. In the absence of argument to the contrary from defendants, the court sees no reason that the pay records will be inadequate to drive a class-wide assessment of compensation issues. *See* Pl.'s Ex. 13, ECF No. 188-14 (interrogatory responses describing pay records); *see also Balderrama-Baca v. Clarence Davids and Co.*, 318 F.R.D. 603, 622 (N.D. Ill. 2017) (recognizing utility of pay records in class-wide analysis of damages). From this class-wide evidence, the jury can assess "the *range of commissions* earned by door-to-door workers," a fact issue, "to determine if Just Energy's commission structure, as applied to the putative class, is compatible with the IMWL." *Wilkins I*, 308 F.R.D. at 181.

### 4. Control Over and Supervision of Class Members

Lastly, defendants point to testimony about the amount of control Just Energy exercised over class members. Wilkins testified that in her experience a "crew coordinator employed by

Just Energy Illinois decided where Wilkins would work and what time she would go home, and transported Wilkins and other door-to-door workers to and from their daily work locations in a van." *Wilkins I*, 308 F.R.D. at 175. Defendants claim that the class members' testimony reveals that class members faced a wide range of practices. One class member testified that some managers exercised differing levels of control over workers. Gordiyo Dep. 63:10-64:1; *also compare* Stanke Dep. 60:21-61 (class supervisor did not allow breaks), *with* Lamb Dep. 56:22-58:1 (supervisor allowed breaks); Phillips Dep. 81:17-82:1 (same). Another class member confirmed that workers who did not show up were not penalized, other than having to work on their own. Gonzalez Dep. 69:2-13.

Just Energy made similar points about differing supervisory practices in 2015. Again, "Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Messner*, 669 F.3d at 815. Applying that principle, this court concluded that "despite the modest differences identified by Just Energy, common issues predominate over issues affecting only individual class members." *Wilkins I*, 308 F.R.D. at 186 (citing *Callahan*, 78 F. Supp. 3d at 811–13). The record showed that "many of the alleged differences between the levels of control over different door-to-door workers are based on whether an individual Just Energy office chose to follow Just Energy's uniform corporate policy. . . ." *Id.* Just Energy does not appear to dispute that management in its individual offices had the right to control numerous aspects of the door-to-workers' workdays. Instead, Just Energy emphasizes ways in which management at the individual offices did not cleave to its policies, such as allowing flexibility about the starting time of the workday. Fundamentally, Just Energy's relationship with the door-to-door workers was based on a uniform "independent contractor" agreement. *Id.* The door-to-door workers were required to

follow the rules, policies, and procedures set forth in Just Energy's employee handbook, Code of

Business Conduct and Ethics Policy, and Compliance Matrix. *Id.*

The manual also sets out a day in the life of an independent contractor:

> Let's look at the components of a typical day as an Independent
> Contractor. An Independent Contractor typically begins their day in
> the late morning with a meeting at the office before going on the road.
> These meetings include updates on regulatory or market information,
> awards, incentives, products and practicing sales techniques. You also
> have time to prepare for the on-road part of the day, ensuring you have
> all the paperwork. We will focus on the customer interaction part of
> your day. While the process may vary in different offices, for the most
> part the steps in the process are the same.

> The manual directs the door-to-door workers to "follow ... Illinois Code of Conduct
> rules" when "introducing Just Energy products and brochures," and provides a list
> of information to disclose when meeting a prospect. It specifies that the door-to-
> door workers "will be dropped off by the Crew Coordinator at the location [they]
> will be working for the day. [The workers] will work from early afternoon until
> early evening in one area, contacting customers." It lists seven mandatory steps to
> take when making a presentation after knocking on a prospect's door, as well as
> numerous rules about explaining Just Energy's product and instructions for how to
> ask a prospect for her current gas bill and convince her to sign an Agreement.

*Wilkins I*, 308 F.R.D. at 186–87 (alterations, internal citations, and quotations omitted).

In their motion to decertify, defendants identify a few examples of the variations in the

practices in various Just Energy offices this court considered in 2015. Defendants have not tied

their three or four examples to anything systemic. *See* Mem. Supp. Mot. to Decertify 13–14, 18–

21, ECF No. 176. Nor do defendants' examples undermine what the manual says: "the process

[for promoting Just Energy's products as a door-to-door worker] may vary in different offices, but

for the most part the steps in the process are the same." *Id.* at 177 (quoting manual; alterations in

original). The court therefore adheres to its conclusion that common issues predominate over the

individual liability issues here. *Id.* (citing *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th

Cir. 2013)).

18

### D. Typicality

Defendants argue, without citing authority and in a single paragraph, that Wilkins can no longer satisfy Rule 23(a)'s typicality requirement because "Plaintiff's experience diverges considerably from other Class Members who testified, as illustrated above. Her testimony can no longer hold this Class together, nor can the policies of Just Energy pointed to by Plaintiff at the original certification stage." Mem. Supp. Mot. to Decertify 21, ECF No. 176. This argument depends on the matters discussed in the foregoing analysis of the class members' testimony, so the court finds it unpersuasive for the reasons already given. Moreover, defendants' failure to cite authority or develop a typicality argument in any depth waives the issue. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 711–12 (7th Cir. 2012) (holding party waived argument by failing to "develop it before the district court"); *Bernal v. NRA Grp., LLC*, 318 F.R.D. 64, 76 (N.D. Ill. 2016) (finding party waived Rule 23 argument because the supporting brief was "conclusory, cite[d] no case law, and [was] one sentence long") (citations omitted)).

### E. Decertifying Damages Class

Defendants alternatively ask the court to decertify the class for damages in light of the parties' agreement to conduct a two-stage trial of liability and, if needed, damages. This court previously denied a similar request based primarily on the district court's reservation of the issue in similar litigation in *Hurt*. When this court denied defendant's request, it was "unclear" whether the evidence here and in *Hurt* differed in any "material way." *Wilkins II*, 179 F. Supp. 3d at 840. This court also could not tell how similar the damages issues in *Hurt* were to the issues here because the parties in *Hurt* were negotiating an individualized claim process. *Id.*

In the instant motion, defendants tell the court that the parties in *Hurt* utilized a process whereby class members submitted individualized claims, and the *Hurt* court had scheduled

19

damages hearings on contested class members' claims in May 2018. Mem. Supp. Mot. to Decertify 22. Though defendants contend that the experience in *Hurt* proves that there is no way to make class-wide damages determinations, they continue to tell this court little to nothing about what means of proof were considered or employed in *Hurt* or how the issues in *Hurt* and this case compare and contrast. *See id.* at 22–23; *see also Wilkins II*, 171 F. Supp. 3d at 804.

Quite apart from *Hurt*, this court also concluded in 2016 that deciding whether to decertify the damages class should await further developments, so the issue can be decided based on a full understanding of the issues.

> The claims of individual class members in this case appear to be small so the court must confirm the extent of available records and explore potential ways to calculate individual damages based on concrete facts, not arguments in briefs. Finally, Wilkins has not been ordered to file a formal trial plan providing specifics about how she intends to establish damages. While the parties appear to agree that there are no records memorializing all of the hours each door-to-door worker spent on the job, "unreported time for each employee could be reconstructed from memory, inferred from the particulars of the jobs the [workers] did, or estimated in other ways—any method that enables the trier of fact to draw a just and reasonable inference concerning the amount of time the employee had worked would suffice." *Id.* Wilkins' attorneys must detail how they intend to proceed.

*Wilkins II*, 171 F. Supp. 3d at 804 (internal quotations and citations omitted) (alterations in original).

Decertifying the damages class would still be premature. Defendants submit that the parties agreed to bifurcate liability and damages here due to the complexity of the damages issues. *See* Tr. of Hr'g held Feb. 15, 2017, at 6–7, ECF No. 176-14 Ex. N. As discussed at the hearing held February 15, 2017, *see id.* at 4–5, plaintiff represents that fact and expert discovery on merits issues, but not damages issues, has been completed. Resp. to Mot. to Decertify 20, ECF No. 188. The court has neither ordered a trial plan nor could it. Plaintiff further represents that she cannot formulate a plan without first conducting fact and expert discovery on damages. *Id.* That is,

despite substantial liability discovery, this case stands in essentially the same position vis-a-vis damages decertification as it did in 2016.  Based on plaintiff's representations, the court continues to believe that decertification  of the class as to damages would be premature.

## Conclusion

For the reasons stated, defendants' second motion to decertify the class and motion to reconsider entry of summary judgment are denied.


Date:   March 22, 2019                          _____/s/_____
                                                Joan B. Gottschall
                                                United States District Judge